IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs October 2, 2018

## STATE OF TENNESSEE v. RONALD JONES

**Appeal from the Criminal Court for Shelby County**
No. 15-06470        James M. Lammey, Judge
_____

No. W2017-00754-CCA-R3-CD
_____

The Defendant, Ronald Jones, was convicted of the second degree murder of the victim and sentenced to serve 25 years. On appeal, he argues that the evidence was insufficient to support the conviction. We disagree and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and NORMA MCGEE OGLE, J., joined.

Joseph A. McClusky, Memphis, Tennessee, for the appellant, Ronald Jones.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Glen Baity and Bryce Phillips, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The Defendant and the victim were on opposing teams in a basketball game at an LA Fitness Center in southeast Memphis. Following disagreements between the two, the Defendant produced a pistol and shot the unarmed victim six times, with the two wounds to his back being fatal. We will set out the proof in the case.

The victim's mother, Wanlisa Pollard, testified that on July 24, 2015, the victim went to the LA Fitness Center ("LAFC") to play basketball with friends. Erick Daugerber said that on the day of the shooting, he had been employed at the LAFC and

had seen the Defendant and his younger brother earlier that day at the center. Later, he observed the Defendant leave the building, followed by ten to twenty people, who slowly returned inside.

Kameron Jackson said that he and Rhumbi Williams went to the LAFC on July 24, 2015, to play basketball. The victim and the Defendant were on opposing teams, and the Defendant called a foul on the victim. When the victim and his friends walked towards the Defendant, he ran to his backpack and reached inside. The victim then said something like, "if you don't put the gun up[,] you [sic] going to die tonight[.]" The Defendant responded that they should go outside and deal with the matter. After they all were outside, the Defendant went to his truck, and the victim said he would not fight because the Defendant had a gun. The victim and his friends returned to the gym. The Defendant also returned and the victim's girlfriend, Keadra Lucas, said that he had a gun. The Defendant raised his voice as he spoke to the victim and then started shooting at him. Mr. Jackson saw the victim fall after the shots were fired.

Dashawn Webb testified that he was a friend of the victim and had gone with him to the LAFC to play basketball. During a game, the victim attempted a shot after the Defendant had asked that play be stopped. After they had argued over this, the game continued until the two began arguing again and were separated by other players. The Defendant ran to his backpack, which he opened, asking others if they were about to jump him. He then said that he wanted to fight the victim, and the group all went outside. They soon returned inside, and Mr. Webb saw that the Defendant had a gun in his pocket. The Defendant said that he was going to shoot the victim and began firing shots, with the victim being wounded as he tried to run.

The testimony of the State's next witness, Rhumbi Williams, was much like that of Mr. Webb. However, Mr. Williams added that, when the Defendant returned to the gym from being outside, he was wearing jean shorts which had pockets, rather than the gym shorts he was wearing when he went outside. The Defendant was asking the victim to fight, but he would not do so. The Defendant then produced a pistol, and began shooting at the victim. After firing six or seven times, the Defendant ran, and Mr. Williams stayed with the victim.

Darius Nelms' testimony tracked that of the two previous witnesses. He added that, while the group of men was outside, the Defendant said that they were standing where he could shoot them. After the group had gone back inside, Mr. Nelms saw the Defendant standing in the doorway, wearing a pair of black jean shorts, and asking the victim to fight. Mr. Nelms was talking with Mr. Webb when he heard gunshots, saw that the victim was on the floor, and he called an ambulance.

- 2 -

Keadra Lucas testified that she had been the victim's girlfriend and was with him at the LAFC the day he was killed. As to the shooting, her testimony paralleled that of the other State's witnesses at the scene. She said the victim asked the Defendant not to pull his pistol just before he started shooting. The victim tried to run and fell at the end of the basketball court.

Dr. Erica Curry testified that she was a medical examiner with the West Tennessee Regional Forensic Center and had performed the autopsy on the victim. He had been shot six times, with two of the wounds to his back, both of which would have been fatal. Dr. Curry said that there was no soot or stippling as to either entrance wound to the victim's back. She said that the toxicology report for the victim was negative as to any common illicit or prescription drugs.

Three employees of the Memphis Police Department testified as to their roles in the investigation. Officer Tristan Brown said that he had recovered on the gym floor several spent forty-caliber casings. Officer Adam Pickering testified that he searched the Defendant's truck for weapons but did not find any. Detective Jonas Holguin said that he had assisted in arresting the Defendant at the apartment of Darius Clark. Following this testimony, the State rested its case-in-chief.

The first witness for the defense, Andre Jones,[1] testified that he was the brother of the Defendant and had been fourteen years old at the time the victim was killed. He and the Defendant had gone to the LAFC to play basketball. The Defendant joined a team playing against the victim's team. One of the Defendant's teammates called a foul on the victim. Later in the game, the Defendant called a foul on the victim, who responded, "y'all calling them b**** a** calls. Y'all acting like b******." After the Defendant had put on his backpack, the victim said that he was going to get something out of his car, and the Defendant should join him. The group went outside, and the victim and the Defendant went to their respective vehicles. The Defendant told Andre that they were going to leave, but Andre realized he had left his own backpack inside and returned to the gym to retrieve it. As Andre was leaving the gym with his backpack, the victim returned from outside and told him that, "[I]f I catch y'all slipping[,] I'm gone [sic] kill y'all on my grandma, on my grandma." Andre was frightened by this, explaining that he was "upset, scared" with a "couple of tears[,]" and told the Defendant what the victim had said. He said that the Defendant said he was "just fixing to . . . squash this because it's really just not that serious, you know." Back inside, Andre saw the Defendant and the victim arguing, with the victim saying, "[O]n my grandmother, like, I'll kill you right now." The victim's friends were circling the Defendant, who was backing up. It looked

---

[1] Because Mr. Andre Jones and the Defendant share the same last name, we will refer to Mr. Jones by his first name. We mean no disrespect by this.

as if the victim "reach[ed] for something[,]" and the Defendant fired his weapon. At this point, Andre ran out the door. The Defendant came to his truck, and both he and Andre were crying. They left the LAFC and went to their parents' house, where the Defendant packed some clothes and left.

The Defendant testified that he had been twenty-two years old at the time of the shooting. At the LAFC, he and the victim were on opposing teams playing basketball. During the game, as the Defendant tried to stop play, the victim tried to score a basket, and then began a "little slight disagreement" with the victim, who accused the Defendant's team of cheating. The teams continued with the game, and the victim grabbed the Defendant and "threw" him to the floor. According to the Defendant, he called a foul on the victim, who then said to the Defendant, "'Clumsy a** n***a, b**** a** n***a[,]' and stuff like that." The victim asked the Defendant if he wanted to fight, and the Defendant responded, "[I]t don't matter." The Defendant said that he was then approached by the victim and the State's eyewitnesses. The Defendant said that he then put on his backpack and told his brother that they were leaving the building. The two were followed by the victim and his friends, as well as some others, saying "they was gone beat our ass and stuff like that." Once outside, the Defendant put on some jean shorts over his basketball shorts. Of the group which had followed him out of the building, some approached the Defendant's car, while others stood in front of the building. His brother had left his backpack in the building and went back inside to retrieve it. After waiting for his brother to return, the Defendant decided to arm himself with his pistol because of the large sizes of the men who had followed them out of the building. Once back inside, the Defendant saw that his brother was crying as he was talking to a woman. He told the Defendant he had been threatened by the victim and his friends. The Defendant asked the victim why he had threatened Andre, and he replied, "F**k you." The victim then told the Defendant that he was going to kill him. The victim came towards the Defendant, who started to back up as he shot the victim. He could not recall how many times he fired the pistol. After shooting the victim, the Defendant and Andre ran to their car and drove to their parents' house. On the way there, the Defendant threw the pistol out the window. He was arrested a few days later at the home of an acquaintance and made a statement to police officers regarding the shooting.

## ANALYSIS

On appeal, the Defendant argues that the evidence is sufficient to sustain a conviction for voluntary manslaughter but not second degree murder. We will review this claim.

To sustain the second degree murder conviction, the State had to prove beyond a reasonable doubt that the Defendant committed a knowing killing of the victim. See

Tenn. Code Ann. § 39-13-210(a)(1). "In second degree murder, the result of the conduct is the sole element of the offense. . . . The statute focuses purely on the result and punishes an actor who knowingly causes another's death." State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). "A person can act knowingly irrespective of his or her desire that the conduct or result will occur." State v. Gray, 960 S.W.2d 598, 604 (Tenn. Crim. App. 1997) (citing State v. Rutherford, 876 S.W.2d 118, 120 (Tenn. Crim. App. 1993)).

As set out in Tennessee Code Annotated section 39-13-211, "[v]oluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner."

The Defendant argues that there was adequate provocation to reduce the charge to voluntary manslaughter. Whether adequate provocation exists so as to support a conviction for voluntary manslaughter is a question for the jury. See State v. Johnson, 909 S.W.2d 461, 464 (Tenn.Crim.App.1995) ("Whether the acts constitute a 'knowing killing' (second degree murder) or a killing due to 'adequate provocation' (voluntary manslaughter) is a question for the jury.")

As is obvious from their verdict, the jurors accredited the State's evidence. The proof showed that, following arguments between the Defendant and the victim, the Defendant, after arming himself with a pistol, and, following a final argument, fired multiple shots at the unarmed victim, apparently as he was attempting to run. Of the six shots, both of the shots into the victim's back would have been fatal. The Defendant then left the scene and threw away his weapon. The State proved the elements of the offense of second degree murder. While the Defendant argues that he had adequate provocation for the shooting, the jury concluded otherwise. Accordingly, we find that the evidence easily supports the Defendant's conviction for second degree murder.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE